MARY L. HEMINGER et al., Appellees, v. M. JOSEPHINE CARNEY et al., Appellants.

**DEEDS:** Action to Set Aside—Fraud and Undue Influence—Breach
1 of Condition.   Evidence reviewed, and held wholly insufficient to set aside the execution of a deed for fraud, undue influence, or breach of conditions.

**JUDGMENT:** Conformity to Proof—Agreement for Support.   Judg-
2 ments not in conformity to the proofs of either party are necessarily erroneous.   So held on the issue as to what was contemplated in an agreement for support of parents.

*Appeal from Van Buren District Court.*—D. M. ANDERSON, Judge.

SATURDAY, JUNE 23, 1917.

REHEARING DENIED SATURDAY, SEPTEMBER 29, 1917.

SUIT to set aside and rescind a contract and deed. A counterclaim was interposed, and, on hearing, both the petition and counterclaim were dismissed. Both parties appeal, the appeal of defendants being first perfected.—*Modified and remanded.*

*Walker & McBeth,* for appellants.

*J. C. Calhoun* and *A. L. Heminger,* for appellees.

LADD, J.—I.   The plaintiffs had lived on
1. DEEDS: action to set aside: fraud and undue influence: breach of condition. the farm in controversy since 1858, with the exception of two short intervals, and had there reared their family of six children. Two sons had died, one leaving a son and the other a daughter. Their son Fred had operated the farm on a sort of partnership basis for several years prior to 1905 or 1906, when he sold to a neighbor 66 acres of his farm adjoining, and 44 acres thereof to his mother, from whom he had purchased the entire tract some years previous, and went to Canada. Plaintiffs took care of the farm from then on until about the first of March, 1912. Owing to the weight of years, the husband, Valentine, wrote to Fred that they would sell the place to him for $13,000, reserving the occupancy of the house during their lives. Fred declined the offer, and proposed to pay $11,000. This was not accepted, and, when an account of this was given to Mrs. Carney, who then lived at Charleston, Illinois, by her sister, Mrs. Fowler, who was visiting her, the former sent word to plaintiffs that she and her husband would like the opportunity to buy the farm. Thereupon, plaintiffs addressed the following letter to Mrs. Carney:

"Keosauqua, October 11, 1910. Dear Children;- I understand by Emma's letter you would like to have the farm. The farm is worth about $15,000. You can have it for $10,000 and what we owe you. You can pay for it on those terms at our death. Emma $3,000; Amos $4,000; Fred $1,000; Blanch $1,000; George's boy $1,000. And if the last two die before you pay it the proceeds to be divided equal. Or if you wish you can have it made in payments. We want to hold the farm for life. We want $300 a year rent and for you to pay the tax. You will not have to furnish anything in the house or kitchen unless you wish while ours last. We will give you our best cow. We want you to keep one horse for us to drive. We intend to sell everything else. If you should want anything you can come and buy it. We will make you a deed for the farm at once. We will have enough to pay our funeral expenses. I could sell the farm for more than that, but your Ma will not. Let us know at once what you will do, as we want to sell our stuff at once. I cannot tend to it.

"Dear Daughter; If you take the farm we will expect to live with you the rest of our lives, and expect you to board us free of charge. The farm ought to rent for $500 or more. Your Pa wanted to go to town but I do not want to go. I guess I have wrote enough. Love to all.

"Mary L. Heminger.
"V. Heminger."

Shortly afterwards, Mrs. Carney and her husband visited her parents, and as they were on the way back, arranged to take the farm. Another son, an attorney at law, Amos, prepared the contract, and it was forwarded to the Carneys for signature. It did not meet their approval, and they had an attorney at Charleston prepare another contract, which was forwarded to defendants and was signed by them. The terms were substantially those of the letter, save that

but $3,000 was to be paid Amos, and the $1,000 to be used for the care of plaintiffs, if required, and if not, to be divided between Amos, Mrs. Fowler, and Mrs. Carney. The plaintiffs thereupon conveyed the farm, containing 224 acres, to the defendants, the deed containing a condensed recital of the main features of the contract and reserving a life estate in the grantors. The Carneys went into possession in February, 1911, and this suit to set aside the contract and deed because of having been obtained by undue influence and breaches of the terms thereof, was begun August 7, 1913.

We have examined this record with care, and agree with the trial judge in the conclusion that the evidence does not warrant the relief prayed. In disposing of these issues, the opinion of the district judge is so pertinent that we quote excerpts therefrom with approval:

"There seems to have been no trouble during the first year. Beginning in 1912, more or less differences arose between the plaintiffs and the defendants. When they moved onto the place, the defendants purchased considerable of the property thereon belonging to defendants, and gave their notes for it at a low rate of interest. They did not pay these notes when they became due, and this caused considerable feeling. They were eventually paid. They got through the year 1912, and in the spring of 1913, Amos Heminger took charge of the business for the plaintiffs and tried to make an amicable adjustment. The defendants in the meantime had built a new barn on the place, had rebuilt a great deal of fence, and had done some clearing and had improved the place generally. They could not agree upon a settlement, and the upshot of the controversy was the bringing of this suit, in August, 1913. The first question to determine is whether the contract was obtained by fraud and undue influence practiced upon the plaintiffs by the defendants. From what has been said, there can be but

one answer to this question. The plaintiffs were getting old. They were both in the full possession of their mental faculties. They were desirous of making provision for their declining years, and at the same time wishing to preserve their estate so that their children and grandchildren would get the benefits of it. They wanted some member of their family to buy the farm. They first offered it to Fred, with whom they could not make terms. * * * Aside from the $2,000 which was allowed them over and above their prospective share of the estate, they were paying all the farm was worth. The farm had been offered to Fred for $13,000 and refused. They were to pay $300 per year rent and board plaintiffs, and the board was worth from $8 to $10 per week. This would be paying from $800 to $1,000 per year for the farm, and that was more than it was worth, aside from the prospect of a rise in its value and the opportunity to improve it. The plaintiffs had full knowledge of the contract, had the advice of Mrs. Fowler and their son Amos, who both approved it, and in addition made a contract which was advantageous to them and their estate. There was no overreaching by the defendants; everything was fair and aboveboard; and the only conclusion that can be arrived at upon this question is that there was no fraud nor undue influence in entering into the execution of the contract. * * * The next and important question in the case is as to whether the defendants have breached the contract to such an extent that the deed may be set aside and the contract rescinded. The plaintiffs complain of many small incidents of neglect and mistreatment, and rely upon them as a breach of the contract. One is in taking down a coverlid which was being used as a door curtain and not putting it back, allowing the curtains to become dirty and dusty, not furnishing good wood for fuel, turning their horse out of the barn, not feeding the horse, not inviting them into the Carney's side of the house to visit their com-

pany, in having nothing but fried mush for breakfast on
one occasion and telling Mrs. Heminger that she could eat
that or nothing, not having chicken when they wanted it,
and a number of other incidents of like character and trivial
in their nature.    The defendants explain some of these
away, and others they confess and excuse, on the ground
that Valentine Heminger is of high temper and domineered
over them and cursed them so that they did not feel like
going out of their way to do things for him.    The board
furnished was good, as is shown by all the witnesses that
testify.    Mr. Heminger is rather high tempered and domi-
neering, and there was considerable temper upon the other
side.    They clashed occasionally, and the defendants too
frequently did not stop to think that the plaintiffs were
old people and had but few years to be with them.    They
should have been and should be indulgent with them and
should put up with their peculiarities.    If the mother want-
ed a coverlid up for a door screen instead of a lace curtain,
she should be allowed to have it so.    If they wanted to use
their old stove instead of a new one, they should be allowed
that privilege.    If the father wanted to smoke in the house,
he should be allowed to do so, even at their inconvenience.
Old people have their ideas and ways fixed, and they cannot
be changed like children, and should be indulged in them.
The defendants should have thought more about the comfort
of the plaintiffs and less about their little differences, and,
had they done so, this lawsuit with its discord and unpleas-
antness would not have occurred.    The main trouble is that
Mrs. Carney is a Heminger, and pitting one Heminger
against another is like striking steel against steel.    In order
that a contract of this character should be set aside, there
should be some substantial breach.    A great accumulation
of little things long continued might amount to such sub-
stantial breach.    There has been no substantial breach in
this case.    There have been a number of incidents that have

been unpleasant. Plaintiffs have been responsible for some of them, and the defendants have been responsible for others. Taken all together, they do not amount to enough to set aside the contract nor to rescind it. This airing in court has given vent to some of the pent-up feelings, and with what the court has said and found as to the $2,000 item, the probabilities are that the future relations of these parties will be much more harmonious. The old people should be furnished a comfortable, pleasant and agreeable home during the few remaining years of their lives, and for what they are getting it is up to the defendants to provide it, and this they should do, not only as a matter of dollars and cents, but in fulfillment of that filial love which a daughter owes to her parent and which she in turn expects when the sands of life are about run out and she arrives at a time when kind words and attention from her children are worth more than all the world besides."

This disposes of this portion of the case to our entire satisfaction.

II. The defendants interposed a counterclaim for services rendered in washings done for plaintiffs and extra care bestowed while sick. The trial court construed the contract as contemplating such services to be rendered for the $2,000, and included in the decree this clause:

2. JUDGMENT: conformity to proof: agreement for support.

"The court further finds and it is so ordered and decreed that the item of $2,000, stated in the contract as allowance to the defendant M. Josephine Carney on the purchase price of the farm in payment of indebtedness owing to her from the plaintiffs, was in fact intended as and for extra care and expense of keeping and caring for the plaintiffs over and above their board and lodging. And it is therefore ordered and adjudged that the counterclaim or expense account of the defendants, claimed for washing

and extra care of the plaintiffs, is disallowed and dis-
missed."

The evidence does not warrant the conclusion reached.
The consideration named in the contract is $15,000. Of
this, $9,000 was to be paid to the children and grandchildren
upon the death of the survivor of plaintiffs, and $1,000 as
stated above. Mrs. Carney's share was computed at $3,000.
With reference to the remaining $2,000, the contract re-
cited that:

"It is agreed that said M. Josephine Carney shall be
allowed $2,000 on the purchase price in payment of any
claim she may have against the parties of the first part at
present time."

This was repeated later on and also contained in the
deed, and, with reference thereto, Mrs. Casey testified that
she had taught school for 6 or 7 years and let her father
have her earnings in excess of what she spent and that her
father executed a mortgage securing the repayment there-
of; and that, shortly after she moved to Charleston, she
sent the mortgage and a release thereof to her father upon
his request, to enable him to sell the property covered
thereby, he promising to return a note for the amount;
and that the note was never received; and that this was the
basis of the quoted clause in the contract. The record of a
chattel mortgage, dated December 21, 1885, from father
to daughter, was introduced in evidence. The letter offers
the farm "for $10,000 and what we owe you." Her father
testified:

"I will tell you exactly what I meant by 'any claim she
might have against me at that time.' You know where
there is a lot of children you give one more than you do the
other, and it makes hard feelings. I put that in there to
throw them off."

He denied ever having owed her anything or ever hav-
ing executed a chattel mortgage to her, and declared that

if he did, it was settled, and he did not remember having written for a release. It is apparent that neither party tendered evidence supporting the theory of the court, and it cannot be upheld. The testimony of Mrs. Carney is strongly corroborated by the letter, contract, deed and mortgage; and the circumstance that the land was not worth to exceed $13,000 when the contract was made is as consistent with her testimony as with that of her father. In either event, there is no occasion to amend the agreement. Under the contract, defendants were to furnish board and lodging, and anything more than these and not incidental thereto, defendants were not required, under the terms of the contract, to supply. Whether, in view of the situation, they might recover for services rendered Mrs. Carney's parents, in the absence of an agreement, express or implied, to pay therefor, and the amount they should recover, were not passed on by the trial court, and the cause will be remanded for the entry of a decree not inconsistent herewith, and for such accounting. As the court should have found for defendants on all the issues, all the costs of the trial should have been taxed against plaintiffs, and the decree will be modified in this respect also. The plaintiffs have departed this life since the appeals were taken, and, to facilitate final adjustment, it may be as well to allow either of the parties to amend the pleadings so as to include in the accounting all matters prior to the death of plaintiffs, the allowance on the counterclaim in no event to exceed the $1,000 mentioned in the contract for the especial use of plaintiffs.—*Modified and remanded.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.